## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| Marc Hughes, on behalf of himself and all others similarly situated, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| FCA US LLC, a Delaware Limited Liability Company, Defendant. | ) ) ) |

Court File No._____

CLASS ACTION COMPLAINT

JURY TRIAL DEMANDED

Plaintiff Marc Hughes individually and on behalf of all others similarly situated ("the Class"), alleges the following:

## I.     INTRODUCTION

1.     A car's gear shifter causes a stationary car to remain stationary unless and until the operator wants the car to move. Every car contains this basic safety feature. However, in order for this feature to be effective, the design must be such that the car's operator knows when the car is safe to exit because it is in the "park" gear, or the gear shift must include a safety override that automatically puts the car in park when the drivers' door is opened and pressure is taken off the foot brake.

2.     FCA US LLC ("FCA" or "Defendant") failed to implement an effective gear shifter in its 2012-2014 Dodge Chargers, 2012-2014 Chrysler 300

vehicles, 2014-2015 Jeep Grand Cherokee vehicles, and 2014 Maserati Quattroporte and Ghibli vehicles (collectively "Defective Shifter Vehicles"). These cars all contain gear shifters designed and manufactured by ZF Friedrichshaffen AG ("ZF"), which does not have the traditional "PRND" gear selector (park, reverse, neutral, drive), but rather always moves back to a central location after being engaged (the "ZF Shifter"). The ZF Shifter design is dangerously defective because there is no tactile or position feedback to the operator as to whether the car has actually been placed into the safe-to-exit "park" gear and there is no safety override that automatically puts the car in "park" if the driver's door is open and pressure is taken off the foot brake.

3.     This design defect poses a serious safety issue. Over 300 accidents have been reported to both FCA and the National Highway Traffic Safety Administration ("NHTSA"), a number of which involved serious injuries to drivers or passengers. Recently, a young Hollywood actor named Anton Yelchin was crushed to death when his 2015 Jeep Grand Cherokee rolled down his driveway and pinned him against his brick mailbox.

4.     This design defect was avoidable. FCA competitors, including BMW, use similar electronic shift levers that return to center after being engaged. However, on the BMW, if the car is not in "park" and the driver's door is opened and the foot brake is released, the car automatically shifts into "park," thus making it impossible

2

for the car to roll-away and cause the types of accidents that have occurred with FCA's vehicles.

5.      Although FCA has been receiving complaints and accident reports since at least early 2015, FCA did not initiate a voluntary recall of the over 811,000 Dodge Charger, Chrysler 300, and Jeep Grand Cherokees in the United States until April of 2016 and, to date, has only sent a letter to vehicle owners describing the design defect of the ZF Shifter and advising drivers to double check that the car is in park and the parking brake is on before exiting the vehicles. FCA has not yet implemented a global fix for the issue even though it knows what must be done. FCA did not expand its recall to include the Maserati vehicles, which also have the ZF Shifter, until June 24, 2016.

6.      FCA has unreasonably delayed implementing a fix to a defect that they have been aware of for many months and that has caused injuries to car owners and property. Nearly a million cars with defective ZF Shifters remain in use and, as a result of this defect, these cars are unsafe and have a diminished value. The value of these vehicles will remain depressed, even if an effective fix is eventually applied.

7.      Through this lawsuit, Plaintiff seeks to remedy the injuries and loss to property suffered as a result of the defective ZF Shifter, to force FCA to promptly fix the Defective Shifter Vehicles by replacing the defectively designed ZF Shifter and/or installing a safety override system, like in the BMW, and to require FCA to

3

compensate owners of Defective Shifter Vehicles for the loss of value resulting from the dangerous design defect.

8.     Plaintiff brings this action individually and on behalf of all other owners or lessees of Defective Shifter Vehicles. Until the defectively designed ZF Shifters in the Defective Shifter Vehicles are replaced with gear selectors that cannot be unintentionally left in drive or neutral when a driver gets out the car, every owner of a Defective Shifter Vehicle is at risk of accident, injury, or even death. Plaintiff seeks damages, injunctive relief, and equitable relief for the conduct of FCA related to the defectively designed gear selector as alleged in this Complaint. Specifically, Plaintiff seeks: immediate installation of a safety override system or replacement of the defective ZF Shifter, provision of a temporary replacement vehicle while replacement is pending, and/or buyback of the Defective Shifter Vehicles, compensation for any additional amount spent on maintenance as a result of any "fix"; restitution for purchase of extended warranties that will go unused; and punitive damages for FCA's knowing fraud that put drivers in Wisconsin and nationwide at risk.

## II.     JURISDICTION

9.     This Court has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members, the amount in controversy exceeds $5,000,000, exclusive of costs and

interest, and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 27 U.S.C. § 1367.

## III.   VENUE

10.   Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. FCA is headquartered in this District, in Auburn Hills, MI.

## IV.   PARTIES

**A.   Plaintiff**

11.   Plaintiff Marc Hughes is a resident of, and is domiciled in, Holmen, WI. Mr. Hughes owns a 2014 Chrysler 300. He purchased the car because of its reputation for safety and utility, consistent with his review of Chrysler's advertising messaging regarding safety and reliability. Mr. Hughes believed his 2014 Chrysler 300 would be a good value because of its utility and reputation for safety. Plaintiff still owns his 2014 Chrysler 300. Unknown to Plaintiff at the time the vehicle was purchased, the vehicle was equipped with a ZF Shifter that is defectively designed. The design defect allows the driver to get out of the car while the car is not in "park", which can allow the car to roll-away from its parked position. The defect in the dodge Charger has caused Plaintiff out-of-pocket losses, future attempted repairs, loss of warranty value, and diminished value of his vehicle. FCA knew that the ZF Shifter could lead to vehicle roll-away incidents, but did not disclose this

defect to Plaintiff, so Plaintiff purchased the vehicle on the reasonable, but mistaken, belief that the 2014 Chrysler 300 was safe to operate as designed.

**B.    Defendant**

12.    Defendant FCA US LLC ("FCA") is a limited liability company organized and existing under the laws of the State of Delaware, and is wholly owned by holding company Fiat Chrysler Automobiles N.V., a Dutch corporation headquartered in London, United Kingdom. FCA is doing business in the Eastern District of Michigan and elsewhere. FCA's principal place of business and headquarters is in Auburn Hills, Michigan.

13.    FCA (commonly referred to as Chrysler) is a motor vehicle manufacturer and licensed distributor of new, previously untitled Chrysler, Dodge, Jeep, and Ram brand motor vehicles. FCA's Chrysler brand is one of the "Big Three" American automobile brands. FCA engages in commerce by distributing and selling new and unused passenger cars and motor vehicles under its Chrysler, Dodge, Jeep, and Ram brands. As of 2015, FCA is the seventh largest automaker in the world by unit production.

14.    FCA's business operations in the United States include the manufacture, distribution, and sale of motor vehicles and parts through its network of independent, franchised motor vehicle dealers. FCA is engaged in interstate

commerce in that it sells vehicles through this network located in every state of the United States.

15.     FCA and/or its affiliates and agents developed and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the Defective Shifter Vehicles.

## V.     FACTUAL ALLEGATIONS

### A.     The ZF Shifter

16.     FCA sold its 2012-14 Dodge Charger, 2012-14 Chrysler 300, 2014-15 Jeep Grand Cherokee, and 2014 Maserati Quattroporte and Ghibli vehicles with an 8-speed transmission with electronic gear selector that was made for FCA by ZF (the "ZF Shifter").

17.     On its website announcing a "voluntary recall" of the Dodge Charger, Chrysler 300, and Jeep Grand Cherokee vehicles on April 22, 2016, FCA describes the ZF Shifter as follows:

The vehicles affected by this recall are equipped with electronic shift levers that return to the same position after each manipulation. Gear selection is conveyed to the driver by multiple sets of indicator lights, not gear-selector position, and unless due care is taken, drivers may draw erroneous conclusions about the status of their vehicles.[1]

---

[1] *See* http://media.fcanorthamerica.com/newsrelease.do?id=17455&amp;mid=1 (last viewed on August 24, 2016).

18.     The ZF Shifter does not have positions for each gear setting, i.e., Park, Reverse, Neutral, Drive ("PRND"), rather, it always rests in the same position after having been pushed up or down from that position. The following is a picture of the ZF Shifter in a Jeep Grand Cherokee:



19.     The ZR Shifter does not include a safety override that prevents the driver from getting out of the car when it is not in "park." Other manufacturers, including BMW, use monostable electronic gear shifters like the ZF Shifter, but *the BMW gear shifter has a safety override*. If the BMW is not in "park" and the driver's door is opened, releasing the foot brake causes the car to *automatically shift into "park."* This safety override eliminates the possibility of the roll-away incidents that plague the Defective Shifter Vehicles.

20.     FCA recognizes that the ZF Shifter is defective. In its April 22, 2016,

letter to Defective Shift Vehicles owners, FCA says, "To address customer

satisfaction issues, the Company began equipping the Charger and 300 with a new

shift-lever design in model-year 2015. The Grand Cherokee's shift-lever was

updated in model year 2016."[2]

21.     As of April 12, 2016,  according to its own recall chronology, FCA had

identified approximately 700 field reports related to the gear shift defect, including

212 crashes, 308 claims of property damage and 41 injuries.[3]

## B.     NHTSA Determines the ZF Shifter is Defectively Designed

22.      The NHTSA Office of Defects Investigation ("ODI") opened

Preliminary Evaluation PE15-030 on August 20, 2015, to investigate 14 reports of

rollaway 2014-15 Jeep Grand Cherokee vehicles.[4]

23.     As described by NHTSA:

The MY 2014-2015 Grand Cherokee vehicles are equipped with Monostable
electronic ("E-shift") gearshift assemblies supplied by ZF Group (ZF). The E-shift
system operates electronically and the gear requested by the driver is transmitted
from the shifter via the CAN Bus to the Transmission Control Module which
makes the requested shift. The Monostable gearshift does not move into a detent
but springs back to a centered/neutral position after the driver selects a gear and
releases the shifter. A button on the shift knob must be depressed to shift out of
Park, shift out of Neutral, and to shift from Drive to Reverse or Park. The gear

---

[2] *Id.*
[3]  *See* http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM514516/
RMISC-16V240-7112.pdf (last accessed August 24, 2016).
[4] *See* http://www-odi.nhtsa.dot.gov/acms/cs/jaxrs/download/doc/UCM497024/
INOA-EA16002-6630.PDF (last accessed August 24, 2016).

selected is shown on a display in the dash and illuminated letters on the shifter. If the driver's door is opened when the gearshift is not in Park, a chime sounds and a message is displayed on the EVIC to warn the driver. In addition, the engine Start/Stop push-button control logic does not permit normal engine shut-off when the transmission is not in Park. This logic may provide feedback to drivers who attempt to turn the engine off when the transmission is not in Park. ***However, this function does not protect drivers who intentionally leave the engine running or drivers who do not recognize that the engine continues to run after an attempted shut-off.*** NHTSA testing during PE15-030 indicates that ***operation of the Monostable shifter is not intuitive and provides poor tactile and visual feedback to the driver, increasing the potential for unintended gear selection***. ODI's analysis of the PE15-030 complaint and field report data identified ***306 incidents of vehicle rollaway following intended shifts to Park in the 2014-2015 Grand Cherokee. These resulted in 117 alleged crashes. Twenty-eight of the crashes reportedly caused injuries, including 3 with a fractured pelvis and 4 others requiring some degree of hospitalization*** (a ruptured bladder, fractured kneecap, broken ribs, damaged to right leg). Other injuries include reports of a broken nose, facial lacerations requiring stitches, sprained knees, severe bruising, and trauma to legs. MY 2012-2014 Chrysler 300 and Dodge Charger vehicles (Lcars) equipped with 3.6L engines use the same ZF Monostable shifter. ODI has received 8 complaints, including 4 crashes and 2 injuries on the subject L-cars. FCA changed the shifter design in the L-cars in MY 2015 and in the Grand Cherokee vehicles in MY 2016. An Engineering Analysis has been opened to assess the scope, frequency, and safety-related consequences of the alleged defect.[5]

24.     In early February 2016, after receiving additional reports of roll-away vehicles, NHTSA upgraded its investigation to an engineering analysis, after determining the issue is one of design rather than defect.[6]

---

[5] *See id.*

[6] *See id.*

## C.   Reports to the NHTSA of Vehicle Rollaway

25.   NHTSA has received hundreds of reports of rollaway incidents

involving the Defective Shifter Vehicles, including the reports copied verbatim

below:

### 1.   Chrysler 300

ON FEBRUARY 7, 2016, MY HUSBAND PARKED HIS
2014 CHRYSLER 300 IN A PARKING SPOT IN A
PARKING LOT AND EXITED THE VEHICLE WITH
THE ENGINE RUNNING. I WAS SEATED IN THE
FRONT PASSENGER SEAT WITH OUR 11 YEAR OLD
CHILD BEHIND ME AND 9 YEAR OLD CHILD
SEATED BEHIND THE DRIVER'S SEAT. ALL 3 OF US
WERE WEARING SEAT BELTS. MY HUSBAND
WALKED ACROSS THE PARKING LOT AND DOWN
THE BLOCK. I WAS TEXTING SOMEONE ON MY
CELLPHONE WHEN MY 11 YEAR OLD EXCLAIMED
THAT THE CAR WAS MOVING. WITHOUT LOOKING
UP FROM MY PHONE, I EXPLAINED TO his THAT IT
WAS PROBABLY THE ILLUSION OF A CAR PULLING
INTO OR OUT OF THE PARKING SPOT BESIDE US.
SHE SCREAMED, "NO THE CAR IS DEFINITELY
MOVING!" THE CAR WAS ACCELERATING
BACKYWARDS. I MADE EVERY EFFORT TO MOVE
THE GEARSHIFT, GRAB THE STEERING WHEEL AND
HIT THE BRAKES BUT DUE TO THE SIZE OF THE
LARGE CONSOLE I COULD NOT SWING MY LEG REVERSE ACROSS THE
PARKING LOT AND STRUCK
AN UNOCCUPIED VEHICLE THAT WAS PARKED ON
THE OPPOSITE SIDE OF THE LOT. THANKFULLY,
THE CAR DID NOT STRIKE ANY PEDESTRIANS OR
OCCUPIED VEHICLES, AS THIS WAS A BUSY
PARKING LOT. OUR CHRYSLER ENDURED
SIGNIFICANT DAMAGE WHILE THE DAMAGE TO
THE OTHER VEHICLE WAS MINOR. MY CHILDREN
AND I WERE EXTREMELY UPSET. WE ARE VERY

GRATEFUL THAT NO ONE WAS PHYSICALLY
INJURED BUT WE WERE ALL QUITE SHAKEN BY
THE OUT OF CONTROL CAR. THE IMPACT WAS
SUCH THAT IT MAKE A LOUD "THUD" SOUND
WHEN IT COLLIDED WITH THE OTHER VEHICLE
AND JOLTED US A BIT. WE WERE COMPLETELY
SHOCKED THAT THE CAR SEEMINGLY ON IT'S
OWN WENT FROM "PARK" INTO "REVERSE". MY
HUSBAND HAD TIME TO WALK ACROSS THE
PARKING LOT AND DOWN THE BLOCK BEFORE THE
VEHICLE STARTED TO MOVE. THE VEHICLE WAS
LONG OUT OF HIS SIGHT BEFORE IT STARTED TO
MOVE. THIS CAR IS DANGEROUSLY DEFECTIVE.
WE REPORTED THIS INCIDENT TO OUR INSURANCE
CARRIER THE NEXT DAY.

THE CONTACT OWNS A 2014 CHRYSLER 300. WHILE
THE VEHICLE WAS ON AND PARKED, THE DOOR
WAS OPENED TO EXIT THE VEHICLE. AFTER
RETURNING TO THE VEHICLE, IT INDEPENDENTLY
SHIFTED INTO REVERSE AND ROLLED AWAY. THE
CONTACT WAS STRUCK BY THE PASSENGER SIDE
DOOR AND FELL TO THE GROUND. THE VEHICLE
ROLLED OVER THE CONTACT'S ANKLE AND
CRASHED INTO A FENCE. THE CONTACT
SUSTAINED INJURIES THAT REQUIRED MEDICAL
ATTENTION, WHICH INCLUDED FRACTURED RIBS.
A POLICE REPORT WAS FILED. THE
MANUFACTURER WAS MADE AWARE OF THE
FAILURE. THE APPROXIMATE FAILURE MILEAGE
WAS 37,000.

THE CAR WAS PUT INTO PARK AND ROLLED DOWN
THE DRIVEWAY, ACROSS THE STREET, INTO A
RAVINE AND HIT A TREE.

ON NUMEROUS TIMES I HAVE NO IDEA WHAT
GEAR THE TRANSMISSION IS IN. I PARK THE CAR
AND THINK IT IS IN PARK ONLY TO FIND OUT IT IS
IN REVERSE.AS I AM STEPPING OUT OF THE CAR IT

STARTS TO BACK UP. THIS IS A DANGEROUS DESIGN FLAW BY CHRYSLER CORP.THERE NEEDS TO BE SOME SORT OF SAFETY MECHANISM INSTALLED TO MAKE SURE THE ENGINE IS OFF UPON EXIT.

I FEEL THE GEAR SELECTOR ON MY 2014 CHRYSLER 300 IS VAGUE, CONFUSING, AND DANGEROUS. IT IS ELECTRONIC AND PIVOTS INSTEAD OF MOVING ONE SPOT FOR EACH GEAR SELECTION. IF YOU PARK AND ATTEMPT TO SHIFT FROM DRIVE TO PARK SOMETIMES IT MAKES IT AND SOMETIMES IT ENDS UP IN REVERSE. WHEN THIS HAPPENS THE ENGINE DOES NOT TURN OFF WHEN YOU PUSH THE STOP BUTTON AND AS YOU STEP OUT THE CAR TAKES OFF BACKWARDS. ALSO WHEN SHIFTING FROM PARK TO DRIVE SOMETIMES IT GOES PAST DRIVE AND INTO LOW, SO I ENDED UP DRIVING FOR A TIME STUCK IN LOW GEAR AND NOT KNOWING UNTIL YOU GO TO SLOW OR STOP AND IT FEELS LIKE THE BRAKES ARE STUCK ON SO YOU START LOOKING FOR THE REASON. I HAVE HATED THIS CAR ALMOST SINCE I LEASED IT IN DECEMBER OF 2014. I FEEL WITH THE LACK OF A SWITCH KEY TO TURN THE ENGINE ON AND OFF, AND THIS VAGUE GEAR SELECTOR THIS GROUP OF VEHICLES IS AN ACCIDENT WAITING TO HAPPEN. I HAVE TRIED TO TRADE IT IN BUT I STILL HAVE 13 MONTHS LEFT AND CAN DO NOTHING. PLEASE LOOK INTO THIS...THANK YOU

THE GEAR SHIFTER ON THIS CAR CONTINUALLY CAUSES THE CAR TO NOT SHIFT TO THE DESIRED GEAR, ESPECIALLY WHEN SHIFTING FROM DRIVE INTO REVERSE OR PARK. THANKFULLY, I HAVE NOT HAD ANY MAJOR ACCIDENTS BECAUSE OF THIS DEFECT, HOWEVER, I HAVE DAMAGED MY DAUGHTER'S BICYCLE AND MY GARAGE DOOR BECAUSE THE CAR WAS NOT IN PARK. THIS IS A SERIOUS ACCIDENT WAITING TO HAPPEN.

13

THE CONTACT OWNS A 2012 CHRYSLER 300. WHILE
THE VEHICLE WAS PARKED, IT ROLLED BACK IN
REVERSE AND KNOCKED THE CONTACT TO THE
GROUND. THE VEHICLE CRASHED INTO A
DUMPSTER ACROSS THE STREET. THE BUMPER OF
THE VEHICLE WAS DAMAGED. THE CONTACT
SUSTAINED INJURIES TO THE HEAD FROM THE
IMPACT OF THE BOTTOM OF THE VEHICLE DOOR.
MEDICAL ATTENTION WAS NOT REQUIRED AND A
POLICE REPORT WAS NOT FILED. THE
MANUFACTURER WAS NOT MADE AWARE OF THE
ISSUE. THE FAILURE MILEAGE WAS UNKNOWN.

THE GEAR SHIFTER SOMETIMES DOES NOT GO
INTO PARK AND ON ONE OCCASION I GOT OUT OF
THE CAR WITHOUT REALIZING AND IMMEDIATELY
JUMPED BACK IN, REENGAGING THE PARK
POSITION. SINCE THAT TIME, I DOUBLE CHECK
EACH TIME BEFORE GETTING OUT. HAVE NOT
LIKED THIS SHIFTER SINCE I BOUGHT THE CAR IN 2012,
SINCE OBTAINING THE CORRECT GEAR
TAKES SOMETIMES SEVERAL ATTEMPTS. MY WIFE
ALSO HAS THIS DIFFICULTY.

THE CONTACT OWNS A 2013 CHRYSLER 300. THE
CONTACT STATED THAT THE VEHICLE DID NOT
REGISTER THE SHIFTER IN THE PARK POSITION
AND THE VEHICLE ROLLED AWAY. THE CONTACT
WAS ABLE TO REGAIN CONTROL OF THE VEHICLE.
THE FAILURE RECURRED WITHOUT WARNING. THE
CONTACT RECEIVED NOTIFICATION OF NHTSA
CAMPAIGN NUMBER: 16V240000 (POWER TRAIN);
HOWEVER, THE PARTS TO DO THE REPAIR WERE
NOT AVAILABLE. THE CONTACT STATED THAT
THE MANUFACTURER EXCEEDED A REASONABLE
AMOUNT OF TIME FOR THE RECALL REPAIR. THE
MANUFACTURER WAS NOT NOTIFIED OF THE
FAILURE. THE FAILURE MILEAGE WAS 52,000. VIN
TOOL CONFIRMS PARTS NOT AVAILABLE.

14

THE CONTACT OWNS A 2013 CHRYSLER 300. WHILE
THE CONTACT WAS EXITING THE VEHICLE, THE
GEAR SHIFTED FROM PARK TO REVERSE WITHOUT
WARNING. AS A RESULT, THE CONTACT WAS
DRAGGED ON THE GROUND. THE PASSENGER IN
THE VEHICLE HAD TO MOVE OVER AND DEPRESS
THE BRAKE PEDAL IN ORDER TO STOP THE
VEHICLE. THE CONTACT RECEIVED LEG AND FACE
INJURIES THAT REQUIRED MEDICAL ATTENTION. A
POLICE REPORT WAS NOT FILED. THE CONTACT
HAD NOT TAKEN THE VEHICLE TO THE DEALER
FOR DIAGNOSTIC TESTING. SHORTLY AFTER THE
INCIDENT, THE CONTACT RECEIVED A RECALL
NOTIFICATION FOR NHTSA CAMPAIGN NUMBER:
16V240000 (POWER TRAIN), WHICH WAS DIRECTLY
RELATED TO THE FAILURE. THE VEHICLE WAS
NOT REPAIRED. THE MANUFACTURER WAS MADE
AWARE OF THE FAILURE AND INFORMED THE
CONTACT THAT A SECOND NOTICE REGARDING
THE REMEDY WOULD BE ISSUED. THE
APPROXIMATE FAILURE MILEAGE WAS 85,000. VIN
TOOL CONFIRMS PARTS NOT AVAILABLE.

THE CONTACT OWNS A 2013 CHRYSLER 300. WHILE
THE VEHICLE WAS PARKED, IT ROLLED AWAY
AND CRASHED INTO A VAN WITHOUT WARNING.
BOTH VEHICLES WERE DENTED, BUT DRIVABLE.
NEITHER THE DEALER NOR THE MANUFACTURER
WERE MADE AWARE OF THE FAILURE. THERE
WERE NO INJURIES AND A POLICE REPORT WAS
NOT FILED. THE CONTACT RECEIVED
NOTIFICATION OF NHTSA CAMPAIGN NUMBER:
16V240000 (POWER TRAIN); HOWEVER, THE PART
TO DO THE REPAIR WAS UNAVAILABLE. THE
FAILURE MAILLEAGE WAS 57,000. VIN TOOL
CONFIRMS PARTS NOT AVAILABLE.

VEHICLE SHIFTER WILL NOT OPERATE PROPERLY,
THERE ARE TIMES I THOUGHT CAR WAS IN PARK

15

AND IT WAS IN REVERSE. I MOVE SHIFTER FROM PARK TO DRIVE AND IT IS STILL IN PARK. GO TO PUT IT IN REVERSE AND IT BYPASSES THE GEAR. TIMES I PUT IT IN DRIVE AND IT IS IN NEUTRAL. TAKEN CAR BACK TO DEALER FOR PROBLEM AND WAS TOLD TO LIVE WITH IT, NOTHING CAN BE DONE. ONE TIME I GOT OUT THINKING CAR WAS IN PARK AND IT WAS IN REVERSE AND STARTED TO MOVE, LUCKILY I WAS IN A FLAT PARKING AREA AT THE TIME.

MY CAR WAS PARKED IN A PARKING LOT IDLING IN PARK WHILE I WAS AT AN ATM MACHINE AND JUMPED OUT OF PARK AFTER I HAD JUST GOT TO THE ATM AND HIT ANOTHER CAR THAT WAS PARKED. I HAD TO REPLACE THE ENTIRE FRONT OF MY CAR AND HAVE IT PAINTED AT A HIGH COST TO ME. I DIDN'T TAKE ANY PHOTOS. I BOUGHT THE PARTS FROM EBAY AND HAD THE BUMPER AND COVER PAINTED AT A LOCAL CHRYSLER DEALER.

### 2. Dodge Charger

VEHICLE ROLLAWAY, ENGINE ON. RE: ODI PE1530 AND EA 16002. I EXITED MY VEHICLE WITH THE ENGINE RUNNING AND THE TRANSMISSION WAS NOT IN PARK. THE VEHICLE HILL START ASSIST GAVE ME ENOUGH TIME TO EXIT THE VEHICLE AND THEN IT BEGAN TO ROLL BACKWARD. THE OPEN DRIVER'S SIDE DOOR KNOCKED ME DOWN AND DRAGGED ME 50 FEET. MY RIGHT LEG AND FOOT WENT UNDER THE LEFT FRONT WHEEL WHICH PULLED ME OUT FROM UNDER THE OPEN DOOR. THE VEHICLE CONTINUED ROLLING BACKWARD OVER AN EMBANKMENT AND CRASHED ON THE ROAD BELOW. THE VEHICLE WAS A TOTAL LOSS AND I SUSTAINED A SEVERE SPRAIN TO MY RIGHT FOOT. I HAVE PICTURES AND AN INSURANCE CLAIM REPORT TO PROVIDE

PROOF OF THIS INCIDENT

TWICE I PULLED IN MY DRIVEWAY AND THOUGHT
I PUT THE CAR IN PARK AND WENT TO GATHER MY
THINGS BEFORE SHUTTING THE CAR OFF AND
INSTEAD OF BEING IN PARK THE CAR CONTINUED
FORWARD. THE FIRST TIME IT SCRAPED MY SIDE
FENCE AND THE SECOND UNTIL IT HIT MY CHAIN
LINK GATE BENDING THE POSTS AND TAKING THE
FENCE GATE OFF THE POSTS. THE FENCE GATE
THEM PROCEEDED TO FALL ON TOP OF THE HOOD
OF THE CAR. BECAUSE I WAS GATHERING MY
ITEMS OFF THE SEAT I DIDN'T NOTICE THE CAR
MOVING UNTIL I HEARD THE CRUNCHING SOUND

THE CONTACT OWNS A 2014 DODGE CHARGER.
WHILE THE VEHICLE WAS PARKED, IT
INDEPENDENTLY ROLLED BACK AND CRASHED
INTO ANOTHER PARKED VEHICLE. THE AIR BAGS
FAILED TO DEPLOY. A POLICE REPORT WAS NOT
FILED. THERE WERE NO INJURIES. THE FAILURE
WAS EXPERIENCED PRIOR TO RECEIVING THE
NOTICE FOR NHTSA CAMPAIGN NUMBER:
16V240000 (POWER TRAIN). THE MANUFACTURER
WAS NOT NOTIFIED. THE FAILURE MILEAGE WAS
36,923

### 3.    Jeep Grand Cherokee

MY WIFE PULLED THE CAR INTO A COMMUNITY
PARK AND PUT THE JEEP IN PARK AND OPENED
THE DOOR TO GRAB his SONS LOST DOG. NEXT
THING he KNOWS THE JEEP IS ROLLING, AND
PROCEEDS TO RUN his OVER AND CONTINUES
DOWN A SMALL HILL INTO SOME TREES. he WAS
TAKEN TO THE HOSPITAL VIA A 911 CALL AND WE
ARE NOW WAITING FOR RESULTS FROM AN MRI.
THIS PROBLEM COULD HAVE KILLED his IF SHE
DIDN'T GET his HEAD OUT OF THE WAY.

ON AUGUST 19, 2014, I STEPPED OUT OF MY
STATIONARY 2014 JEEP GRAND CHEROKEE
OVERLAND BELIEVING I HAD PUT THE VEHICLE IN
PARK ON A GENTLE CITYSTREET SLOPE WHEN IT
SUDDENLY MOVED BACKWARD, ROLLING OVER
MY LEFT LEG AND SEVERELY DAMAGING MY
KNEE, SKIN, ARTERY, AND QUAD MUSCLES. MY
WIFE IMMEDIATELY CALLED AN AMBULANCE,
WHICH TRANSPORTED ME TO A LOCAL HOSPITAL,
WHERE DOCTORS SURGICALLY ATTACHED AN
"EXTERNAL FIXATOR" IN THREE PLACES,
STABILIZING AND COMPLETELY IMMOBILIZING
MY LEG (FOR THE NEXT FIVE WEEKS). AFTER A
SECOND SURGERY AND OVER A YEAR OF PAINFUL
AND ARDUOUS THERAPY LATER, I CAN NOW
WALK WITH A KNEEBRACE, HALTINGLY AND
WITH A NOTICEABLE LIMP. . . ALL DUE TO THE
JEEP GRAND CHEROKEE'S TRANSMISSION THAT
DOES NOT ACCURATELY INDICATE WHAT GEAR IT
IS IN! UNLESS ONE IS CONCENTRATING 100+% OF
THE TIME ON THE CONSOLE SHIFTERAND
CONSTANTLY GLANCING AT THE INDICATOR
LIGHTS ON THE VEHICLE DASHBOARD THE
DRIVER NEVER KNOWS WHAT POSITION THE
JEEP'S TRANSMISSION IS IN! THE SHIFTER ON THE
CONSOLE ALWAYS LOOKS EXACTLY THE SAME,
NO MATTER WHAT GEAR HAS SUPPOSEDLY BEEN
SELECTED. WE HAD NO ABSOLUTELY
FOREWARNING OF THE POTENTIAL
LIFETHREATENING PROBLEM INHERENT IN THIS
VEHICLE'S DESIGN, AND I CAN ONLY THANK GOD
THAT I'M STILL ALIVE TODAY. LAST WEEK WE
WERE SURPRISED TO RECEIVE WRITTEN
NOTIFICATION FROM FIAT CHRYSLER
AUTOMOBILES THAT THE COMPANY AND NHTSA
HAD RECALLED 2014 JEEP GRAND CHEROKEES FOR
THE SPECIFIC DEFECT DESCRIBED IN MY INCIDENT
ABOVE!. (FINALLY! VINDICATION!) THE RECALL
NUMBER IS SHOW BELOW, I BELIEVE. FCA
VEHICLE RECALL NUMBER: S27 / NHTSA 16V240

ON FEBRUARY 25TH, I SHIFTED MY CAR INTO PARK
AND WAS GETTING OUT TO LOOK AT BACK WIPER
WHICH SEEMED TO BE STUCK. I HAD LEFT THE
CAR RUNNING. THE CAR TOOK OFF IN GEAR AND
CAUSED ME TO FALL AND BREAK MY ANKLE IN
AN OPEN COMPOUND FRACTURE THAT REQUIRED
HOSPITALIZATION AND SURGERY. MY JEEP ENDED
UP HITTING A PARKED GARBAGE TRUCK AND
SUSTAINED ABOUT $5000 DAMAGE. WHO KNOWS
WHAT MY MEDICAL BILLS WILL END UP BEING.
PLUS MY ANKLE MAY NEVER BE RIGHT. I WILL
INCLUDE A PHOTO OF MY CAR AND XRAY. IT
HAPPENED ON PRIVATE PROPERTY (TACO BELL
PARKING LOT). A POLICE OFFICER CAME AND
PARKED MY CAR AND CALLED AN AMBULANCE
BUT DID NOT MAKE A REPORT SINCE ON PRIVATE
PROPERTY. WE HAVE NOT HEARD FROM GARBAGE
TRUCK AND DOUBT IT DID ANYTHING TO IT. THE
CAR WAS IN PARK AND NOT SURE HOW FAST WAS
GOING WHEN HIT THE GARBAGE TRUCK

THE CONTACT OWNS A 2014 JEEP GRAND
CHEROKEE. AFTER SHIFTING INTO PARK AND
REFUELING THE VEHICLE, IT FAILED TO ENGAGE
INTO PARK AND STARTED TO ROLL AWAY. AS A
RESULT, THE VEHICLE ROLLED OVER THE DRIVER
AND FRACTURED 22 RIBS, THE CLAVICLE, AND AN
ANKLE. MEDICAL ATTENTION WAS REQUIRED. A
POLICE REPORT WAS FILED. THE VEHICLE WAS
NOT TAKEN TO THE DEALER. THE
MANUFACTURER WAS MADE AWARE OF THE
FAILURE. THE VEHICLE WAS NOT REPAIRED. THE
VIN AND FAILURE MILEAGE WERE UNKNOWN.

THE CONTACT OWNS A 2014 JEEP GRAND
CHEROKEE. AFTER PLACING THE VEHICLE INTO
THE PARK POSITION AND ATTEMPTING TO EXIT,
THE VEHICLE INDEPENDENTLY ROLLED BACK
AND CRASHED INTO A TELEPHONE POLE. THE AIR

BAGS DID NOT DEPLOY. A POLICE REPORT WAS
NOT FILED AND NO INJURIES WERE SUSTAINED.
THE VEHICLE WAS TAKEN TO THE DEALER WHERE
IT WAS DIAGNOSED THAT THE TRANSMISSION
SHIFTER MECHANISM FAILED. THE VEHICLE WAS
NOT REPAIRED. THE CONTACT MENTIONED THAT
THE FRONT DRIVER SIDE DOOR WAS DESTROYED.
THE MANUFACTURER WAS MADE AWARE OF THE
FAILURE. THE FAILURE MILEAGE WAS 8,944.

THE JEEP'S ELECTRONIC TRANSMISSION DID NOT
FULLY SHIFT IN TO THE "PARK" POSITION WHILE
STILL RUNNING. MY WIFE EXITED THE VEHICLE
TO TAKE OUR 3 YEAR OLD FROM THE BACK SEAT
AND THE JEEP BEGAN TO ROLL AWAY. he RAN
AND JUMPED IN TO THE DRIVER'S SEAT TO STOP IT
AND IN THE PROCESS his FOOT SLIPPED FROM
THE BRAKE TO THE GAS PEDAL DRIVING THE CAR
INTO/THROUGH A HOUSE. SIGNIFICANT DAMAGE
WAS DONE TO THE VEHICLE AND THE HOME BUT
NO ONE WAS INJURED.

VEHICLE WAS PUT IN PARK. I EXITED THE CAR.
WIFE WAS SITTING IN CAR IN PASSENGER SEAT.
CAR WAS NOT MOVING. WIFE EXITED CAR TO
RETRIEVE ITEM FROM HOUSE. RETURNED TO FIND
VEHICLE DOWN THE HILL AND IN THE WOODS

REGARDING RECALL 16V240. I AM WRITING TO
ENCOURAGE NHTSA TO REQUIRE FCA TO REPLACE
THE ELECTRONIC SHIFT SELECTOR WITH ONE
THAT STAYS IN THE POSITION CORRESPONDING
TO THE TRANSMISSION GEAR SELECTION. MORE
DISPLAY WARNINGS AND PRINTED CARDS WILL
NOT SOLVE THE USER INTERFACE PROBLEM
CREATED BY THE SHIFTER MOVING BACK TO
CENTER REGARDLESS OF THE TRANSMISSION
GEAR SELECTION. ON NUMEROUS OCCASIONS, I
HAVE MOVED THE SHIFT SELECTOR FORWARD
FROM DRIVE TOWARD PARK, THINKING THAT I

HAD HEARD/FELT 3 CLICKS AND THAT I WAS IN
PARK, ONLY TO FIND THAT THE VEHICLE IS IN
REVERSE.

THE CONTACT OWNS A 2014 JEEP GRAND
CHEROKEE. THE CONTACT STATED THAT AFTER
SHIFTING THE VEHICLE INTO THE PARK POSITION
AND EXITING, THE VEHICLE INDEPENDENTLY
SHIFTED INTO THE DRIVE POSITION. AS A RESULT,
THE VEHICLE ROLLED FORWARD AND CRASHED
INTO THE CONTACTS GARAGE. A POLICE REPORT
WAS NOT FILED AND NO INJURIES WERE
REPORTED. THE VEHICLE WAS INSPECTED BY THE
MANUFACTURERS ENGINEER BUT THE FAILURE
WAS UNDETERMINED. THE MANUFACTURER WAS
NOTIFIED OF THE FAILURE AND THE VIN WAS
INCLUDED IN NHTSA CAMPAIGN NUMBER:
16V240000 (POWER TRAIN). THE FAILURE MILEAGE
WAS UNKNOWN.

ELECTRONIC SHIFTER DOES NOT ENGAGE IN TO
PARK. ON NUMEROUS OCCASIONS THE CAR HAS
STARTED TO ROLL WHEN I THOUGHT IT WAS IN
PARK. THE SHIFTER IS TERRIBLY DANGERS AND
CUMBERSOME TO USE CORRECTLY TO FIND
GEARS. THIS IS ALWAYS WHEN PARKING OR WHEN
STARTING UP. DANGEROUS.

THE CONTACT OWNS A 2014 JEEP GRAND
CHEROKEE. THE CONTACT STATED THAT WHILE
THE DRIVER LEFT THE VEHICLE RUNNING WITH
THE GEAR SHIFTIER IN PARK, THE VEHICLE
ROLLED AWAY AND CRASHED INTO A PARKING
GARAGE. THE VEHICLE WAS TAKEN TO A DEALER
WHERE THE FAILURE WAS UNABLE TO BE
DETERMINED. THE VIN WAS NOT INCLUDED IN
NHTSA CAMPAIGN NUMBER: 16V240000 (POWER
TRAIN). THE MANUFACTURER WAS NOTIFIED OF
THE FAILURE. THE FAILURE MILEAGE WAS 5,514.

INSD PUT CAR IN PARK, WHEN EXITED VEHICLE, VEHICLE ROLLED DOWN A HILL AND HIT A TREE.

I PARKED MY VEHICLE IN MY DRIVEWAY AND EXITED THE VEHICLE TO ENTER MY HOME. I WAS IN THE HOUSE FOR 5 MINUTES AND HEARD A LOUD CRASH, UPON LOOKING OUT THE WINDOW MY VEHICLE HAD COME OUT OF GEAR AND DROVE ITSELF THROUGH MY GARAGE DOOR DAMAGING THE DOOR, THE FRONT END OF MY JEEP AND MY HARLEY INSIDE THE GARAGE.

MY INITIAL COMPLAINT WAS THE VEHICLE NOT SHIFTING INTO PARK CORRECTLY WHICH I NOW SEE FIAT CHRYSLER IS PREPARED TO ISSUE A RECALL. HOWEVER, THE SOLUTION OFFERED IS IN MY OPINION INSUFFICIENT. WARNINGS AS OPPOSED TO A REAL FIX IS TOTALLY UNACCEPTABLE AND I BELIEVE NHTSA MUST DEMAND A REPLACEMENT OF THE ENTIRE SHIFT MODULE.

I HAVE A 2015 JEEP GRAND CHEROKEE WITH A MONOSTABLE GEAR SHIFTER. NUMEROUS TIMES I HAVE HAD THE CAR GO INTO AN UNDESIRED GEAR. ON OCTOBER 20, 2015, I DROVE THE CAR INTO THE GARAGE TO PARK IT; I PLACED IT IN WHAT I THOUGHT TO BE PARK, EXITED THE VEHICLE, AND THEN THE VEHICLE (IN REVERSE) STARTED TO DRIVE OUT OF THE GARAGE. I WAS CAUGHT BETWEEN THE DOOR AND CAR AND UNABLE TO GET BACK IN DUE TO THE SPEED OF MOVEMENT. AS THE CAR BACKED OUT, THE DOOR CAUGHT ON THE MAIN SUPPORT COLUMN TO THE HOUSE AND BENT BACKWARDS; EVENTUALLY THE DOOR HINGE GAVE OUT AND THE CAR CLEARED THE GARAGE. ONCE IN THE DRIVEWAY AND WITH THE DOOR OUT OF THE WAY, I WAS ABLE TO RUN FAST ENOUGH TO GET INTO THE CAR AND STOP IT BEFORE IT DROVE INTO THE

HOUSE ACROSS THE STREET. THE CAR HAD ENOUGH SPEED TO SCREECH WHEN THE BRAKES WERE APPLIED. MY SHOULDER AND ARM WERE BADLY BRUISED BUT I DID NOT SEEK MEDICAL ATTENTION. THE HOUSE DAMAGE WAS MOSTLY MINOR; WE ARE AWAITING AN INSPECTION TO VERIFY THE COLUMN'S INTEGRITY. THE CAR DAMAGE WAS SUBSTANTIAL, REQUIRING A NEW DOOR AND TWO NEW PANELS. MY INSURANCE COMPANY, USAA, COVERED THE DAMAGE (MINUS DEDUCTIBLE). MY BROTHER HAD A SIMILAR EXPERIENCE IN A CHRYSLER 300 WITH THE SAME SHIFTER, HE BACKED INTO ANOTHER CAR WHEN HE THOUGHT THE VEHICLE WAS IN PARK. MY WIFE HAS MADE THE MISTAKE ON OUR JEEP A NUMBER OF TIMES AS WELL, BUT he HAD NOT GOTTEN OUT OF THE VEHICLE COMPLETELY BEFORE NOTICING THE ERROR.

ON 11/3/2015, I PUT MY CAR IN PARK, ENGINE WAS STILL RUNNING, AND I EXITED VEHICLE. HOWEVER, CAR DID NOT GO INTO PARK, ROLLED FORWARD, KNOCKED ME DOWN AND ROLLED OVER MY LEFT FOOT WITH BACK REAR TIRE. THE PARKING GEAR DID NOT ENGAGE AND I WAS NOT ALERTED THAT IT WAS STILL IN DRIVE. THIS OCCURRED IN A PARKING LOT. SOMEHOW I GOT UP, WAS ABLE TO RUN AFTER CAR AND DIVE IN CAR AND HIT GEARSHIFT INTO NEUTRAL TO STOP IT. I ENDURED A CRUSHED FOOT AND FOUR MONTHS OF THERAPY. THERE WAS NOT DAMAGE TO THE CAR NOR DID I REPORT TO POLICE.

3/7/16 CAR WAS PARKED AT WALMART PARKING LOT, ENGINE WAS LEFT RUNNING WITH MY WIFE IN PASSENGER SEAT. AFTER APPROX. 20 MIN. THE CAR BEGAN TO REVERSE. CAR WENT APPOX. 60 FT AND HIT ANOTHER PARKED CAR, MOVING IT APPROX. 1 1/2 FT SIDEWAYS. THE OTHER CAR WAS HIT ON DRIVER SIDE BETWEEN THE DOORS. MY

WIFE ATTEMPTED TO STOP THE JEEP AFTER IT HIT
THE OTHER CAR WHILE he WAS STILL IN THE
PASSINGER SEAT, AND THE CAR WENT FORWARD
TO THE SAME PARKING SPOT, JUMPED 12 IN
CURB,WENT UP A THREE BERM AND STOPPED
WHEN IT HIT A CONCRETE BASE FOR A LIGHT
POLE. I'M 81 YEARS OLD AND I'VE OWNED MANY
CARS AND THIS IS THE WORST SHIFTING SYSTEM
I'VE EVER HAD. I HAVE ALSO RENTED MANY CARS
IN MANY COUNTRIES AND NEVER HAD A SHIFTER
AS BAD AS THIS JEEP. THIS JEEP IS NOT SAFE!!! FOR
PICTURES AND INCIDENT REPORT #1614797, CALL
POLICE OFFICER JENNIFER HINES #134 CITY OF
LOVELAND,CO, PHONE:9709622502 EXT. 1134

I AM PUTTING IN A COMPLAINT FOR MY 2015 JEEP
GRAND CHEROKEE AND THE ELECTRONIC
SHIFTER. ON MULTIPLE OCCASIONS, I HAVE BEEN
IN A SITUATION WHERE QUICKLY SELECTING
GEARS OR SWITCHING GEARS WAS NECESSARY IN
ORDER TO AVOID A HAZARDOUS SITUATION. I
HAVE ALSO EXPERIENCED INSTANCES WHERE I
THOUGHT I HAD PUT THE CAR IN PARK WHEN I
HAD ACTUALLY SELECTED REVERSE, BECAUSE
THE TACTICAL FEEDBACK OF THE SHIFTER
VARIES FROM TIME TO TIME, AND IS NOT
CONSISTENT AT ALL. I AM EXTREMELY
DISAPPOINTED IN THE CHOICE OF SHIFTER FOR
THIS VEHICLE. I HAVE HAD ABOUT 15 CARS IN MY
LIFE, BOTH MANUAL AND AUTOMATIC, AND THIS
IS BY FAR THE WORST DESIGN I'VE EVER
SEEN/USED. THIS IS A DANGEROUS SHIFTER AND
SHOULD BE COMPLETELY SWITCHED OUT FOR
ONE OF A DIFFERENT DESIGN. CARS SHOULD
NEVER BE ALLOWED TO USE THE MONOSTABLE
SHIFTER DESIGN. THEY ARE TERRIBLE. PLEASE
HELP FIX THIS PROBLEM BEFORE SOMEONE ELSE
GETS HURT!

### 4. Maserati

THE CONTACT OWNS A 2014 MASERATI QUATTROPORTE GTS. WHILE PARKED, THE VEHICLE STARTED WITHOUT ANY ACTIVATION. THE VEHICLE WAS NOT DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE VIN WAS UNKNOWN. THE APPROXIMATE FAILURE MILEAGE WAS 11,280

### D. FCA and ZF Maintain There is No Defect

26.     While FCA has acknowledged it knows of 41 injuries that may be related to what it describes as a "confusing" shifter, it has stated: "the vehicles involved in these events were inspected and no evidence of equipment failure was found."[7]

27.     ZF issued a press release stating:

ZF supplies gearshift systems to automotive manufacturers according to their technical and design specifications. The manufacturer designs the integration of the gearshift system into the vehicle operating concept and develops the respective safeguard mechanisms. ZF delivered a fully functional state-of-the-art product, which was integrated into the vehicle architecture by the manufacturer. As such, ZF is unaware of any indications that claims could be made against ZF in the context of the current NHTSA investigations of the FCA vehicle models "2014-15 Grand Cherokee; 2012-14 Charger & 300 w/3.6 l engine.

28.     The Defective Shifter Vehicles have been under investigation by the NHTSA since August 20, 2015, yet FCA concealed detailed information on the

---

[7] *See* http://jalopnik.com/fiat-chrysler-is-recalling-1-1-million-cars-because-peo-1772561060 (last accessed on August 24, 2016).

defect by marking as confidential all but two pages from its owner's manual in the presentation it provided to NHTSA in response to its investigation. FCA has purposefully kept consumers and its customers in the dark about the ZF Shifter defect.

**E.    FCA Emphasizes Safety and Design in Its Marketing**

29.    As its "Mission," FCA touts its commitment to "safety and connected vehicles: with a specific focus on all aspects of safety (active, passive and preventative) and on the development of efficient info-mobility systems."[8]

30.    Following extensive press in 2014 and 2015 that FCA was neglecting its obligations regarding safety, FCA claimed to have a "commitment to safety":[9]

> At FCA, our dedication to vehicle safety is consistent with our commitment to being a good corporate citizen, one that judges itself not only on its ability to grow as a global enterprise but also by its ability to make a positive, lasting impact on our communities and on society as a whole. In 2015, FCA US continued to focus efforts on refining recall processes and procedures and entered into a consent order with the National Highway Traffic Safety Administration (NHTSA) to undertake specific actions to improve its recall execution. The Company also engaged an independent third party consultant to conduct a comprehensive review and evaluation of existing processes and procedures for compliance with the Safety Act and regulations thereunder and to assist in the development of best practices. In

---

[8] http://www.fcagroup.com/en-US/innovation/Pages/mission.aspx (last accessed on August 24, 2016).

[9] http://reports.fcagroup.com/sustainability/2015/products-and-processes/product-innovation-and-responsible-mobility/vehicle-safety#start (last accessed on August 24, 2016).

addition, as a public safety advocate, we committed our
efforts to support industry and consumer outreach and
education.

In early 2016, FCA US further reaffirmed its commitment to
vehicle safety by signing an agreement, the Proactive Safety
Principles, along with 18 other automakers, to leverage their
knowledge and collaborate to enhance safety of the traveling
public. The Principles include Enhance and Facilitate
Proactive Safety; Enhance Analysis and Examination of Early Warning
Reporting Data; Maximize Safety Recall
Participation Rates; and Enhance Automotive Cybersecurity.

The FCA US Vehicle Safety and Regulatory Compliance
organization made important moves in 2015 to amplify our
commitment to safety, more than doubling the number of
assigned professionals. Among the organization's primary
activities is a substantial investment in the use of predictive
analytics as a tool to more quickly identify potential vehicle
safety issues. The organization is led by a vice president who
reports directly to the CEO of FCA US, ensuring a high level
of information flow and accountability. This structure
establishes a focal point for working with consumers,
regulatory agencies and other partners to enhance real-world
vehicle safety. Another important move in 2015 was the
announcement of the newly established position of Safety
Advocate. The Safety Advocate role is responsible for
promoting greater awareness of vehicle safety - both
internally with FCA US employees, and externally with
regulators, industry observers and trade associations. In
addition to highlighting the Company's vehicle safety
engineering achievements, the Safety Advocate will share
insights about proposed legislation and the evolution of the
vehicle safety landscape.

From a global perspective, the safety organizations in the
four FCA regions continuously share information and best
practices in order to harmonize design guidelines and
processes where possible, given the regulatory environment.
Safety design concepts are implemented from the early

27

phases of every new model through the release of detailed design specifications to all the providers of subsystems for the vehicle. Our approach recognizes that safer highways, improved traffic management and driver education all have a role to play in enhancing safety on the road. That is why we strive to connect our safety efforts to a collective goal we share with our employees, customers, dealers, suppliers, law enforcement, regulators, researchers, educators and others who have a stake in driver, passenger and pedestrian safety. All share a collective responsibility to make our roads safer.

FCA's commitment to transportation safety includes engineering active and passive features for diverse drivers and vehicle segments. In some cases, such as restraint systems, global regulations are very similar and we have developed a worldwide restraint system standardization plan. In other instances, government regulations and third-party ratings standards vary from region to region. Even with this variance, our safety centers continuously collaborate with suppliers to meet internal safety standards designed to address quality and reliability goals.

Within FCA, responsibility for safety is not limited to the designated safety organizations, but cuts across many departments. Numerous individuals at FCA, as well as at our dealerships and within our supply chain, are engaged in tracking and understanding how vehicles perform on a day-to-day basis on the road. This work includes examining accident data in order to understand factors that may need closer investigation and understanding. Within our organization, many centers of expertise contribute to the technological advancement on safety issues by cooperating with public institutions, suppliers, universities and other organizations on research and development into innovative solutions.

31.     With respect to the Jeep Grand Cherokee, FCA advertisements include

the following, touting "over 70 available safety and security features."

28

32.     Likewise, for the Dodge Charger, FCA advertises "always on guard" and "safety and security are built in."

33.     For the Chrysler 300, the message is much the same, touting "Safety you can sense."

34.     On its website, FCA states the following about the brands of the Defective Shifter Vehicles:

   a. Chrysler- "Since the company was founded in 1925, the Chrysler brand has continued to delight customers with its distinctive designs, craftsmanship and intuitively innovative technology– all at an extraordinary value.

   b. Dodge- "Dodge, America's mainstream performance brand, offers a full range of muscle cars, compacts, minivans, crossovers and SUVs. Built for top performance – from power off the line to handling on corners – every Dodge delivers unmatched versatility and excellent fuel efficiency."

   c. Jeep- "Since 1941, the Jeep brand has continued to deliver an open invitation to live life to the fullest, providing customers unique, versatile and capable vehicles that provide owners a sense of safety and security to handle any adventure with confidence."

   d. Maserati- "A tradition of successful cars, each of them redefining the

concept of the Italian sports car and setting new standards in style,

performance, luxury and safety."

35.     Despite its claim to put "safety first," and its professed commitment to

safety, FCA placed into commerce the Defective Shifter Vehicles with monostable

electronic shifters and no override device, putting style and profits first, and

resulting in hundreds of accidents, dozens of injuries, and at least one death.

**F.     FCA's Inadequate Response to the Defectively Designed ZF Shifter**

36.      FCA's failed to timely notify its customers of the dangerous ZF Shifter

defect and to take steps to correct this defect. It issued a recall of the Dodge,

Chrysler and Jeep vehicles at issue in April of 2016 and of the Maserati vehicles in

late June 2016.

37.     As reported in the New York Times on June 21, 2016, Center for Auto

Safety Executive Director Clarence Ditlow said, "There was no sense of urgency on

Chrysler's part or NHTSA's part given the potential for death or injury." The Times

points out that NHTSA "had publicly chastised the company, which acknowledged

delaying recalls in almost two dozen cases going back to 2013 and affecting millions

of vehicles." NHTSA Head Mark Rosekind had said at the time, "[t]his represents a

significant failure to meet a manufacturer's safety responsibilities."[10]

---

[10] http://www.nytimes.com/2016/06/22/business/anton-yelchins-death-highlights-
a-known-issue-with-jeeps.html?_r=0 (last accessed August 24, 2016).

38.     Chrysler promised to speed up its recalls and agreed to pay close to $105 million in penalties. But this case evidences the fact that little has changed. FCA is still putting profits ahead of safety.

39.     Plaintiff and other Class members paid premiums to purchase the Defective Shifter Vehicles. They paid these premiums as a result of the brand, value and safety representations made by FCA. Class members were harmed from the day they drove their Defective Shifter Vehicle off the lot because they did not get what they paid for—a car that was well-designed and safe to operate.

40.     In addition, following the death of actor Anton Yelchin who was crushed by his roll-away 2015 Jeep Grand Cherokee, there has been widespread disclosure of the design defect of the ZF Shifter in the Defective Shifter Vehicles. This press has caused a sharp decrease in the value of the Defective Shifter Vehicles and may have made them essentially unsalable. Plaintiff and each putative class member therefore suffered a direct pecuniary loss in the form of the decreased value of their Defective Shifter Vehicle.

41.     The loss in value is particularly acute and affects Plaintiff and other Class members because they do not want to own unsafe cars that might roll away and crush them or members of their family. Safety and quality of design are at the core of FCA's marketing efforts and a driving factor in purchase decisions. Plaintiff

and other Class members that want to sell their Defective Shifter Vehicles cannot do so without incurring substantial losses.

42.    Moreover, many other Class members purchased their vehicles with financing in the form of car loans or leases. The drop in value of the Defective Shifter Vehicles has caused the financing to be underwater, meaning that Class members will have to pay money over and above whatever they can sell their car for.

43.    In addition, many other Class members purchased expensive extended warranties for their Defective Shifter Vehicles, intending to own the vehicles for many years beyond the initial warranty. However, as a result of the ZF Shifter defect, Class members no longer want to own the Defective Shifter Vehicles and when they sell them, in addition to losses from the cars being worth much less as a result of the defect, they will lose the value of the extended warranties that they purchased.

44.    Further compounding the harm to Class members is that as of the date of this filing, FCA has provided no repair guidance directly to customers. Concerned owners of Defective Shifter Vehicles have been told absolutely nothing about what will happen to their cars, what FCA intends to do, or what owners should do. Instead, FCA has simply sent a letter to registered owners describing the design defect.

45.     FCA did announce on June 22, 2016, that it would begin making software upgrades available for certain models of the Jeep Grand Cherokee by the end of June 2016. The upgraded software would include an "auto park" feature. This accelerated response was prompted by the press and public interest in this issue following Anton Yelchin's death.[11]

46.     However, even with this attempted fix by FCA, at least for the Jeep vehicles, there are still Class members with Defective Shift Vehicles who are not even aware there is an issue with their vehicle. One Jeep Grand Cherokee driver didn't even know about the recall until he brought his vehicle to the dealership to be serviced for something else.[12]

47.     As a result of FCA's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that the ZF Shifter is unsafe and defectively designed, owners and/or lessees of the Defective Shifter Vehicles have suffered losses in money and/or property. Had Plaintiff and other Class members known of the defect at the time they purchased or leased their Defective Shifter Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did.

---

[11] http://www.reuters.com/article/us-fiat-chrysler-recall-idUSKCN0Z919J (last accessed August 24, 2016).
[12] http://www.nydailynews.com/news/national/recalled-jeep-drivers-spinning-wheels-yelchin-death-article-1.2685223 (last accessed August 24, 2016).

# VI.   TOLLING OF THE STATUTE OF LIMITATIONS

**A.   Tolling**

48.   Class members had no way of knowing about FCA's defectively designed ZF Shifters in their Defective Shifter Vehicles. As evidenced by its foot-dragging in resolving the issue and implementing a fix, FCA was intent on expressly hiding its behavior from regulators and consumers. This is the quintessential case for tolling.

49.   Within the time period of any applicable statutes of limitation, Plaintiff and members of the proposed Class could not have discovered through the exercise of reasonable diligence that FCA was concealing the design defect complained of herein and misrepresenting the company's true position with respect to the safety qualities of its vehicles.

50.   Within the time period of any applicable statutes of limitation, Plaintiff and the other Class members could not have discovered through the exercise of reasonable diligence that FCA was concealing the ZF Shifter defect.

51.   For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

**B.      Estoppel**

52.     FCA was under a continuous duty to disclose to Plaintiff and the other

Class members the true character, quality, and nature of the ZF Shifter in the

vehicles at issue.

53.     FCA knowingly, affirmatively, and actively concealed the true nature,

quality, and character of the ZF Shifter in the vehicles at issue.

54.     Based on the foregoing, FCA is estopped from relying on any statutes

of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

55.     Plaintiff brings this action pursuant to the provisions of Rules 23(a),

(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves

and the following proposed classes:

**Nationwide Class**: All persons or entities who purchased or leased a 2012-14
Dodge Charger, 2012-14 Chrysler 300, 2014-15 Jeep Grand Cherokee, or 2014
Maserati Quattroporte or Ghibli.

**Wisconsin Subclass:** All members of the Nationwide Class who are residents of
Wisconsin or purchased or leased their 2012-14 Dodge Charger, 2012-14 Chrysler
300, 2014-15 Jeep Grand Cherokee, or 2014 Maserati Quattroporte or Ghibli, in
Wisconsin.

56.     Excluded from the Class are FCA, its employees, co-conspirators,

officers, directors, legal representatives, heirs, successors, wholly- or partly-owned,

and its subsidiaries and affiliates, FCA dealers, Class counsel and their employees,

and the judicial officers and their immediate family members and associated court staff assigned to this case, all persons who make a timely election to be excluded from the Class, governmental entities, and the judge to whom this case is assigned and his/her immediate family.

57.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

58.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

59.     <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. There are at least 811,000 Defective Shifter Vehicles that have been sold in the United States. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

60.     <u>Commonality and Predominance</u>. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact,

which predominate over any questions affecting individual Class members, including, but not limited to:

    a.  Whether FCA engaged in the conduct alleged herein;

    b.  Whether FCA designed, advertised, marketed, distributed, leased, sold, or otherwise placed the Defective Shifter Vehicles into the stream of commerce in the United States;

    c.  Whether the ZF Shifter system in the Defective Shifter Vehicles contains a safety defect;

    d.  Whether FCA knew about the defect in the ZF Shifter and, if so, how long FCA knew of it;

    e.  Whether FCA designed, manufactured, marketed and distributed the Defective Shifter Vehicles;

    f.  Whether FCA's conduct violates consumer protection statutes, false advertising laws, sales contracts, warranty laws and other laws as asserted herein;

    g.  Whether Plaintiff and the Classes overpaid for their Defective Shifter Vehicles;

    h.  Whether Plaintiff and the Classes are entitled to equitable relief, including but not limited to restitution or injunctive relief- including a repair of the defectively designed ZF Shifter;

i.  Whether Plaintiff and the Classes are entitled to damages and other

monetary relief and, if so, in what amount.

61.     Typicality. Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims

are typical of the other Class members' claims because, among other things, all

Class members were comparably injured through FCA's wrongful conduct as

described above.

62.     Adequacy. Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an

adequate Class representative because his interests do not conflict with the interests

of the other members of the Class he seeks to represent; Plaintiff has retained

counsel competent and experienced in complex class action litigation; and Plaintiff

intends to prosecute this action vigorously. The interests of the Class will be fairly

and adequately protected by Plaintiff and his counsel.

63.     Declaratory and Injunctive Relief. Federal Rule of Civil Procedure

23(b)(2): FCA has acted or refused to act on grounds generally applicable to

Plaintiff and the other members of the Class, thereby making appropriate final

injunctive relief and declaratory relief, as described below, with respect to the Class

as a whole.

64.     Superiority. Federal Rule of Civil Procedure 23(b)(3): A class action is

superior to any other available means for the fair and efficient adjudication of this

controversy, and no unusual difficulties are likely to be encountered in the

management of this class action. The damages or other financial detriment suffered

by Plaintiff and the other Class members are relatively small compared to the burden

and expense that would be required to individually litigate their claims against FCA,

so it would be impracticable for the members of the Class to individually seek

redress for FCA's wrongful conduct. Even if Class members could afford individual

litigation, the court system could not. Individualized litigation creates a potential for

inconsistent or contradictory judgments, and increases the delay and expense to all

parties and the court system. By contrast, the class action device presents far fewer

management difficulties, and provides the benefits of single adjudication, economy

of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

**A.      Claims on Behalf of Nationwide Class**

**COUNT I**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *et seq.*)**
**(on behalf of the Nationwide Class)**

65.      Plaintiff realleges and incorporates by reference all paragraphs as

though fully set forth herein.

66.      This claim is brought on behalf of the Nationwide Class.

67.      Plaintiff is a "consumer" within the meaning of the Magnuson-Moss

Warranty Act, 15 U.S.C. § 2301(3).

68.     FCA is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

69.     The Defective Shifter Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

70.     15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

71.     FCA's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Defective Shifter Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

72.     FCA breached these warranties, as described in more detail above. Without limitation, the Defective Shifter Vehicles are equipped with a defective ZF Shifter that does nothing of the sort and puts vehicle occupants' safety in jeopardy. The Defective Shifter Vehicles share a common design defect in that the ZF Shifter is defectively designed and unsafe, contrary to FCA's representations about its vehicles.

73.     Plaintiff and the other Class members have had sufficient direct dealings with either FCA or its agents (e.g., dealerships and technical support) to establish privity of contract between FCA on one hand, and Plaintiff and each of the other Class members on the other hand. Nonetheless, privity is not required here

40

because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between FCA and its dealers, and specifically, of FCA's implied warranties. The dealers were not intended to be the ultimate consumers of the Defective Shifter Vehicles and have no rights under the warranty agreements provided with the Defective Shifter Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

74.     Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. FCA has had over a year to provide a suitable repair for the ZF Shifters and it has done nothing but send a letter to registered owners of Defective Shifter Vehicles.

75.     At the time of sale or lease of each Defective Shifter Vehicle, FCA knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Defective Shifter Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiff resorts to an informal dispute resolution procedure and/or afford FCA a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

76.     Plaintiff and the other Class members would suffer economic hardship if they returned their Defective Shifter Vehicles but did not receive the return of all

payments made by them. Because FCA is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the other Class members have not re-accepted their Defective Shifter Vehicles by retaining them.

77.     The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

78.     Plaintiff, individually and on behalf of the other Class members, seeks all damages permitted by law, including diminution in value of the Defective Shifter Vehicles, in an amount to be proven at trial.

## COUNT II
### Declaratory Judgment Act, 28 U.S.C. §2201, *et seq.*
### (on behalf of the Nationwide Class)

79.     Plaintiff realleges and incorporates by reference all paragraphs as though fully set forth herein.

80.     This claim is brought on behalf of the Nationwide Class.

81.     Declaratory relief is intended to minimize "the danger of avoidable loss and unnecessary accrual of damages." 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2751 (3d ed. 1998).

82.     There is an actual controversy between Plaintiff and the Classes and FCA concerning whether the ZF Shifter system that FCA placed in the Defective Shifter Vehicles contains a safety defect, whether FCA knew about the defect in the ZF Shifter and, if so, how long FCA knew of it, whether FCA failed to timely notify Plaintiff and the Classes of the ZF Shifter defect, and whether FCA failed to institute a timely recall and fix of the issue.

83.     Pursuant to 28 U.S.C. § 2201, the Court may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

84.     Despite the numerous instances of accidents, injuries and property damage, FCA has never admitted that the ZF Shifter system is defective, instead blaming any issues on customer confusion about how to operate the system.

85.     As a result of FCA's failure to acknowledge and address the defective ZF Shifter, Plaintiff seeks a declaration that the ZF Shifter is defectively designed. This declaratory relief will generate common answers that will settle the controversy related to the alleged defective design of the ZF shifter. There is an economy to resolving these issues as they have the potential to eliminate the need for continued and repeated litigation.

## COUNT III
## Unjust Enrichment
### (On behalf of the Nationwide Class, or, alternatively, the State Subclasses)

86.     Plaintiff realleges and incorporate by reference all paragraphs as though fully set forth herein.

87.     Plaintiff brings this Count on behalf of himself and the Nationwide Class, or, alternatively, the Wisconsin Subclass.

88.     FCA has received and retained a benefit from Plaintiff and the Classes and inequity has resulted.

89.     FCA has benefitted from selling and leasing the Defective Shifter Vehicles whose value was artificially inflated by FCA's concealment of the defective ZF Shifter at a profit, and Plaintiff and the Classes have overpaid for the cars and been forced to pay other costs.

90.     Thus, all members of the Classes conferred a benefit on FCA.

91.     It is inequitable for FCA to retain those benefits.

92.     Plaintiff was not aware of the true facts about the Defective Shifter Vehicles, and did not benefit from FCA's conduct.

93.     FCA knowingly accepted the benefits of its unjust conduct.

94.     As a result of FCA's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

**B.    Claims on Behalf of Wisconsin Subclass**

## COUNT IV
## Violation of W.S.A. § 100.18
### (On behalf of the Wisconsin Subclass)

95.    Plaintiffs realleges and incorporates by reference all paragraphs as though fully set forth herein.

96.    This claim is brought on behalf of the Wisconsin Subclass.

97.    W.S.A. §100.18 prohibits untrue, deceptive, of misleading representations or statements of fact in relation to the sale of products.

98.    FCA violated W.S.A. §100.18 by misrepresenting the safety of the Defective Shifter Vehicles in their advertising and knowingly and intentionally concealing from Plaintiffs and the Class that the Defective Shifter Vehicles suffer from a design defect, by marketing the Defective Shifter Vehicles as possession functional and defect-free transmission systems, and by marketing the Defective Shifter Vehicles as safe when the ZF System is in fact defective and unsafe.

99.    FCA's misrepresentations and omissions in their advertising alleged herein caused Plaintiffs and the other Class members to make their purchases or leases of their Defective Shifter Vehicles. Absent those misrepresentations and omissions, Plaintiffs and the other Class members would not have purchased or leased these vehicles, would not have purchased or leased these Defective Shifter

Vehicles at the prices they paid, and/or would have purchased or leased less expensive alternative vehicles that did not contain defective ZF Shifters.

100.    Additionally, FCA failed to timely take action to recall and/or fix the issue with the defective ZF Shifters once it knew that there is a risk of serious injury or death associated with the Defective Shifter Vehicles.

101.    FCA's conduct is also unfair insofar as it offends public policy, is so oppressive that the consumer has little alternative but to submit, and causes consumers substantial injury.

102.    As a direct and proximate result of the unfair and deceptive acts or practices of FCA alleged herein, Plaintiffs and the Wisconsin Subclass have incurred damages in an amount to be determined at trial.

**COUNT V**
**Breach of Express Warranty**
**(W.S.A. §402.313)**
**(On behalf of the Wisconsin Subclass)**

103.    Plaintiffs realleges and incorporates by reference all paragraphs as though fully set forth herein.

104.     This claim is brought on behalf of the Wisconsin Subclass.

105.    In connection with the purchase or lease of each one of its new vehicles, FCA provides an express New Vehicle Limited Warranty ("NVLW") for a period of three years or 36,000 miles, whichever occurs first. This NVLW exists to cover "defect in materials or workmanship." FCA also provides a powertrain limited

46

warranty that covers the engine and transmission, including the shifter assembly for five years or 100,000 miles, whichever occurs first, for the Defective Shifter Vehicles (FCA has since the 2016 model year reduced its powertrain warranty to five years or 60,000 miles).

106.   FCA's warranties formed the basis of the bargain that was reached when Plaintiffs and other Class members purchased or leased their Defective Shifter Vehicles equipped with the defective ZF Shifter system from FCA.

107.   Plaintiffs and the Class members experienced defects within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiffs and Class members that the Defective Shifter Vehicles were defectively designed, and failed to fix the defective ZF Shifter free of charge.

108.   FCA breached the express warranty promising to repair and correct a manufacturing defect or materials or workmanship of any part supplied by FCA. FCA has not repaired or adjusted, and has been unable to repair or adjust, the Defective Shifter Vehicles' materials and workmanship defects.

109.   Affording FCA a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.

110.   Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and the other Class members whole and because FCA

47

has failed and/or has refused to adequately provide the promised remedies within a reasonable time.

111.    Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

112.    Also, as alleged in more detail herein, at the time FCA warranted and sold the Defective Shifter Vehicles, it knew that the Defective Shifter Vehicles did not conform to FCA's warranties and were inherently defective and FCA wrongfully and fraudulently concealed material facts regarding its Defective Shifter Vehicles. Plaintiffs and the other Class members were therefore induced to purchase or lease the Defective Shifter Vehicles under false and/or fraudulent pretenses.

113.    Moreover, many of the injuries flowing from the Defective Shifter Vehicles cannot be resolved through the limited remedy of "replacements or adjustments," as many incidental and consequential damages have already been suffered due to FCA's fraudulent conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

48

114.    FCA was provided notice of these issues by numerous complaints filed against it, including complaints to NHTSA and the instant Complaint, within a reasonable amount of time after the defect was discovered.

115.    As a direct and proximate result of FCA's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

## COUNT VI
## Breach of Implied Warranty of Merchantability
## (W.S.A. §402.314)
## (On behalf of the Wisconsin Subclass)

116.    Plaintiffs realleges and incorporates by reference all paragraphs as though fully set forth herein.

117.    This claim is brought on behalf of the Wisconsin Subclass.

118.    FCA is and was at all relevant times a merchant with respect to motor vehicles.

119.    A warranty that the Defective Shifter Vehicles were in merchantable condition is implied by law in the instant transactions. These Defective Shifter Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Defective Shifter Vehicles are inherently defective in that the ZF Shifter was not adequately designed, manufactured, and tested.

49

120.   FCA was provided notice of these issues by complaints lodged by consumers with NHTSA—which vehicle manufacturers like FCA routinely monitor— before or within a reasonable amount of time after the allegations of the Defective Shifter Vehicle defects became public.

121.   As a direct and proximate result of FCA's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of members of the Classes, respectfully requests the Court enter judgment in their favor and against Defendant as follows:

A.   Certification of the proposed Classes, including appointment of the undersigned counsel as Class Counsel;

B.   An Order temporarily and permanently enjoining FCA from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.   Injunctive relief in the form of a recall or fee replacement program, including that FCA:

   i.   Notify owners not to drive the Defective Shifter Vehicles until the ZF Shifter defect has been repaired;

   ii.   Provide replacement cars of comparable value to all owners until

50

the Defective Shifter Vehicles are repaired;

      iii.    For buyers who request it, buy the Defective Shifter Vehicles back at original purchase or lease cost with no deduction for use;

      iv.    Fully disclose FCA's plans and intention with respect to the ZF Shifter defect, including the engineering details of the repair and a timeline for implementation;

D.    Equitable relief in the form of buyback of the Defective Shifter Vehicles;

E.    Costs, restitution, damages, including punitive damages, penalties, and disgorgement in an amount to be determined at trial;

F.    An Order requiring FCA to pay both pre and post judgment interest on any amounts awarded;

G.    An award of costs and attorneys' fees; and

H.    Such other or further relief as may be appropriate.

Dated: August 29, 2016           Respectfully submitted,

                              s/Daniel E. Gustafson
                             Daniel E. Gustafson
                             Jason S. Kilene
                             David A. Goodwin
                             Raina C. Borrelli
                             **GUSTAFSON GLUEK PLLC**
                             Canadian Pacific Plaza
                             120 S. Sixth St., Suite 2600
                             Minneapolis, MN 55402
                             Tel:   (612) 333-8844

dgustafson@gustafsongluek.com
jkilene@gustafsongluek.com
dgoodwin@gustafsongluek.com
rborrelli@gustafsongluek.com

Simon Bahne Paris
Patrick Howard
**SALTZ, MONGELUZZI, BARRETT &
BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel:   (215) 575-3986
sparis@smbb.com
phoward@smbb.com